# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| AUTOSCRIBE CORPORATION, and POLLIN PATENT LICENSING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A., and WELLS FARGO FINANCIAL, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 4:10-CV-202-JEG-TJS<br>)<br>)  ORAL ARGUMENT & EXPEDITED<br>)  BRIEFING REQUESTED<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISQUALIFY ATTORNEY MICHAEL C. GILCHRIST AND THE LAW FIRM OF MCKEE, VOORHEES & SEASE, P.L.C. AS COUNSEL FOR PLAINTIFFS

## TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................................1

II.  BACKGROUND FACTS ...................................................................................................2

III. ARGUMENT AND AUTHORITY ....................................................................................6

    A.   Iowa Rules for Disqualification of Former Attorneys .............................................6

    B.   The Substantial Relationship Test ............................................................................8

        1.   The Prior Representation of Wells Fargo and the WFHM Business Unit ................................................................................................10

        2.   The Operation of WFHM is Central to This Litigation .............................13

        3.   Mr. Gilchrist and His Prior Firms' Representations of Wells Fargo and WFHM are Substantially Related to the Issues in this Litigation..............14

    C.   The "Appearance of Impropriety" Standard ...........................................................15

IV.  CONCLUSION..................................................................................................................17

# **TABLE OF AUTHORITIES**

**Cases**

*Civco Med. Instruments Co., Inc. v. Protek Med. Products, Inc.*,
  No. 4:03-CV-40722-JEG-CFB, 2004 WL 1326474 (S.D. Iowa June 4, 2004) ...................... 6, 9

*Doctor John's, Inc. v. City of Sioux City, Iowa*,
  No. C03-4121-MWB, 2007 WL 5788 (N.D. Iowa Jan. 2, 2007) .............................................. 9

*Doe v. Perry Cmty. Sch. Dist.*,
  650 N.W.2d 594 (Iowa 2002) ................................................................................... 9, 15, 16

*Engineered Prods. Co. v. Donaldson Co., Inc.*,
  290 F.Supp.2d 974 (N.D. Iowa 2003) .................................................................................. 8

*Hoffmann v. Internal Med., P.C. of Ottumwa*,
  533 N.W.2d 834 (Iowa Ct. App. 1995) ........................................................................ 5, 7, 9

*In Re Multi-Piece Rim Products Liab. Litig.*,
  612 F.2d 377 (8th Cir.1980) .............................................................................................. 7, 9

*Richers v. Marsh & McLennan Group Assocs.*,
  459 N.W.2d 478 (Iowa 1990) ............................................................................................... 9

*Severino v. Dilorio*,
  186 A.D.2d 178 (N.Y. App. Div. 1992) ............................................................................... 17

*State of Ark. v. Dean Foods Products Co.*,
  605 F.2d 380 (8th Cir.1979) .......................................................................................... passim

**Statutes**

35. U.S.C. § 284 ...................................................................................................................... 14

35. U.S.C. § 285 ...................................................................................................................... 14

**Other Authorities**

Iowa Rule of Professional Conduct 32:1.10(a) ......................................................................... 7

Iowa Rule of Professional Conduct 32:1.9 ............................................................................... 5

Iowa Rule of Professional Conduct 32:1.9(a) ........................................................................... 6

Iowa Rule of Professional Conduct 32:1.9(b) ........................................................................... 6

LR 83.1.g.1 ................................................................................................................................ 6

16 Ia**.** Prac., Lawyer and Judicial Ethics § 5:10(c) (2010) ....................................................... 7

2 Legal Malpractice § 18:7 (2009) ............................................................................................ 8

http://www.ipmvs.com/index.cfm ............................................................................................. 4

I.      **INTRODUCTION**

Wells Fargo Bank, N.A. and Wells Fargo Financial, Inc. (collectively, "Wells Fargo") submit this Memorandum to demonstrate why Michael C. Gilchrist, and the law firm of McKee, Voorhees & Sease, P.L.C. ("McKee"), should be disqualified from representing Plaintiffs Autoscribe Corporation and Pollin Patent Licensing, LLC (collectively, "Autoscribe") in this litigation. Wells Fargo brings this motion after McKee and Mr. Gilchrist declined voluntarily to withdraw. *See* Ex. A.[1] The basis for this motion is simply stated: Mr. Gilchrist, in prior employment, was Wells Fargo's patent lawyer for a number of years, acting as the principal assistant to Mr. Brian Laurenzo, co-counsel to Wells Fargo in this action.

Upon learning that Mr. Gilchrist had taken an active involvement in advancing Autoscribe's interests against his former client, Wells Fargo investigated the nature of Mr. Gilchrist's previous responsibilities respecting Wells Fargo's intellectual property matters. That investigation revealed that Mr. Gilchrist had extensive prior representations involving the Wells Fargo Defendants in substantially related matters. Specifically, during the first decade of his legal career, Mr. Gilchrist, a registered patent attorney, represented Wells Fargo Home Mortgage ("WFHM"), a Wells Fargo business unit based in Des Moines, Iowa, on numerous intellectual property matters. In this case, Autoscribe has specifically accused Wells Fargo's EasyPay$^{SM}$ service, which is WFHM's pay-by-phone service, and other Wells Fargo payment systems of infringing the patents-in-suit, putting WFHM directly at issue in this case. (Dkt. 1 at 3

---

[1] On August 20, 2010, counsel for Wells Fargo sent counsel for Plaintiffs detailed correspondence setting forth why their voluntary withdrawal was required. Counsel for Plaintiffs responded on August 24, 2010 stating their refusal to withdraw. On August 31, 2010, counsel for Wells Fargo replied, informing counsel for Plaintiffs that their position was contradicted by the written record and Iowa law. On September 7, 2010, counsel for Plaintiffs sent the final piece of correspondence pertaining to this issue referring to it as mere "noise," thus indicating implicitly that they did not intend to withdraw from the case.

(identifying "financial transaction payment systems, including the [WFHM] 'EasyPay$^{SM}$' system" as allegedly infringing systems).

As a result of retrieving and reviewing files from Mr. Gilchrist's prior law firm, Dorsey & Whitney, LLP ("Dorsey"), Wells Fargo has uncovered, among other things, an August 20, 2001 letter from Mr. Gilchrist to an in-house Wells Fargo attorney confirming that he had access to highly confidential information that involved technical details pertaining to the WFHM and Wells Fargo financial services, systems and products. Mr. Gilchrist was, therefore, admittedly privy to this information and as part of his job duties he analyzed it for purposes of considering the extent of patent protection available to Wells Fargo.

Following the investigation into Mr. Gilchrist's prior representation of Wells Fargo, counsel for Wells Fargo informed Mr. Gilchrist and the McKee firm of the issue and requested that they acknowledge the conflict and voluntarily withdraw in order to obviate the need to make this motion and involve the Court. They refused. *See* Ex. A. Accordingly, to vindicate the ethical concerns that have been put at risk by Mr. Gilchrist having changed sides, first representing Wells Fargo for many years, with access to, and free interaction with Wells Fargo businesses, their processes and key personnel; and now, accusing his former client of infringing patents controlled by his current client, Wells Fargo brings this motion.[2]

## II.   BACKGROUND FACTS

This action was instituted in the Eastern District of Virginia on January 29, 2010. (Dkt. 1.) The Complaint filed in that court was prepared and executed by the law firm of Crowell &

---

[2] Neither Wells Fargo nor its counsel in this case relish litigation over the ethics of our adversary's representation of the Plaintiffs, but Wells Fargo has no alternative: its former patent lawyer is now its current patent adversary. Iowa law and ethical requirements compel only one conclusion on these facts - disqualification of the McKee firm. Wells Fargo's motion should be granted in all respects.

Moring LLP ("Crowell"), which also, presumably, performed the necessary pre-suit investigation as it relates to the alleged infringement of WFHM's EasyPay$^{SM}$ system and other Wells Fargo payment systems.  Wells Fargo successfully moved that court to transfer the matter here.  (Dkts. 25, 28, and 29.)  Crowell remained Autoscribe's counsel for a period after the litigation was transferred to this Court.[3]

Following transfer to this Court, both Autoscribe and Wells Fargo retained Iowa-based counsel.  Wells Fargo retained Brian Laurenzo, then a partner in the Des Moines office of Dorsey.  (Dkt. 30.)[4]  Autoscribe retained Mr. Gilchrist and the McKee law firm.  (Dkts. 36-38.)  Before accepting that engagement, neither Mr. Gilchrist nor anyone at McKee requested Wells Fargo's consent to permit the McKee firm to take on the representation despite Mr. Gilchrist's prior representation of Wells Fargo, and particularly WFHM, in patent matters.  Subsequently, Messrs. Gilchrist, Sease, and Harty of the McKee law firm all entered appearances in this matter.  (Dkts. 36-38.)  Mr. Gilchrist, specifically, has been copied on several email correspondences pertaining to the litigation, and he has participated in at least one telephone conference with opposing counsel.  *See* Declaration of Brian Laurenzo ("Laurenzo Decl.") at ¶ 36, attached as Ex. B.  Given his prior representation of Wells Fargo in matters substantially related to this litigation, Mr. Gilchrist's employment at the McKee firm alone is enough to warrant disqualification of both he and his firm, but disqualification is particularly warranted under these facts given his active participation in the case.

---

[3] Crowell attorneys signed the Answer to Wells Fargo's Counterclaim (Dkt. 27), and, with Mr. Jeff Harty of the McKee firm, Crowell attorneys attended on behalf of Autoscribe a mediation between the parties that took place on June 1, 2010.  Autoscribe terminated Crowell from this litigation on June 29, 2010.

[4] When Mr. Laurenzo filed his notice of appearance for Wells Fargo on May 10, 2010, he was a partner at Dorsey, but shortly thereafter left Dorsey and joined the law firm Brick Gentry, P.C. (Dkt. 39.)  Rush Nigut of Brick Gentry, P.C. has also now entered an appearance for Wells Fargo.  (Dkt. 40.)

3

To understand the extent of Mr. Gilchrist's prior relationship with Wells Fargo, it is necessary to look to Wells Fargo's relationship with Mr. Gilchrist's former and long-time mentor, Mr. Laurenzo. *Id* at ¶¶ 11-13. Mr. Laurenzo first began representing Wells Fargo's predecessor, Norwest, as an associate patent attorney in 1990 shortly after joining the law firm now known as Davis, Brown, Koehn and Shors, P.C., ("the Davis firm"). *Id.* at ¶ 8. Mr. Laurenzo became a partner at the Davis firm around 1994. *Id.* In 1995, Mr. Laurenzo's firm hired Michael Gilchrist as an associate attorney, and Mr. Gilchrist began what would ultimately be about a decade of representing Wells Fargo or its predecessors in intellectual property matters.[5] *Id.* at ¶¶ 11-17.

When Mr. Laurenzo left the Davis firm in 1998 to join the Des Moines office of Dorsey, Mr. Gilchrist, as Mr. Laurenzo's primary associate, joined him there. *Id.* at ¶ 13. That same year, Norwest acquired Wells Fargo and, following the merger, Mr. Laurenzo and Mr. Gilchrist continued to perform substantially all of the intellectual property legal work for the newly named WFHM division of the combined bank. *Id.* at ¶ 15-16.

After Mr. Laurenzo and Mr. Gilchrist joined Dorsey, Wells Fargo and WFHM awarded them more work on patent issues, including work that involved reviewing business method patents, generally, and evaluating how those types of patents might specifically affect WFHM's business. *Id.* at ¶ 33. This work included reviewing business method patents of WFHM competitors as well as analyzing what processes or methods within WFHM might be patentable. *Id.*

---

[5] Today, Mr. Gilchrist markets himself as something of an expert in patent issues pertaining to the financial services industry. *See* http://www.ipmvs.com/index.cfm (follow "Attorneys" hyperlink; then follow "Michael C. Gilchrist" hyperlink) (stating that Mr. Gilchrist "is a frequent speaker on patent issues in the financial services industry …").

One of the most important internal projects for WFHM at this time was a project known as Ops Strategy, which included the development of an all-encompassing Operations Feasibility Study. *Id.* at ¶ 24. This project involved an extensive evaluation and review of WFHM's internal operations for marketing and servicing its products and services, including the pay by phone service.[6] *Id.* Mr. Gilchrist was significantly involved in reviewing the Operations Feasibility Study in order to evaluate and recommend which WFHM internal processes might be patentable in light of the prior art. *Id.* at ¶ 27. This was not a casual assignment: Mr. Gilchrist spent nearly 200 hours on this project, at the conclusion of which he filed a patent application describing WFHM's proprietary internal processes and methods. *Id.* at ¶¶ 28, 31. This patent application has *never* been made public, and hence its contents remain highly confidential. *Id.* at ¶ 28. During this time, Mr. Gilchrist had regular and direct contact with in-house counsel for Wells Fargo, including at least one attorney who is still one of WFHM's primary in-house attorneys.[7] *Id.* at ¶ 30.

Now, as a result of Autoscribe's retention of the McKee firm and that firm's decision to assign Mr. Gilchrist to work directly adverse to his former client, Mr. Gilchrist finds himself aligned against his former client, seeking to prove that aspects of the financial systems that he

---

[6] The materials related to the Operations Feasibility Study are highly confidential and some documents are subject to the attorney-client privilege and, therefore, they are not attached to the Motion. Wells Fargo "is not required to divulge any actual confidential communication" since "[s]uch a requirement would compromise the confidentiality sought to be protected." *Hoffman*, 533 N.W.2d at 836-37; *see also* Rule 32:1.9, Cmt. 3 ("A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services."). However, if the Court wishes to review these and other documents providing additional evidentiary support for Wells Fargo's motion, Wells Fargo respectfully requests that the Court review those documents in camera.

[7] In addition to Mr. Laurenzo's supporting declaration, Wells Fargo has available, for the Court's in camera review, correspondence from Mr. Gilchrist to a senior in-house lawyer at Wells Fargo describing his work in detail related to the Operations Feasibility Study materials.

studied during his prior representation, infringe a patent held by his new client, Autoscribe, a patent that was already issued when Mr. Gilchrist undertook this assignment for Wells Fargo. Iowa's ethical rules are intended to protect the integrity of the attorney-client relationship, which has been compromised by Mr. Gilchrist's involvement here.

For the reasons detailed below, Iowa law requires that Mr. Gilchrist and the McKee firm be disqualified from representing Autoscribe's interests in this case against the interests of Mr. Gilchrist's former client, Wells Fargo.

## III.   ARGUMENT AND AUTHORITY

### A.   Iowa Rules for Disqualification of Former Attorneys

The starting point of the analysis is that "[t]he grant or denial of a motion to disqualify counsel rests in the discretion of the trial court." *Civco Med. Instruments Co., Inc. v. Protek Med. Products, Inc.*, No. 4:03-CV-40722-JEG-CFB, 2004 WL 1326474, at *2 (S.D. Iowa June 4, 2004). 'The Iowa Rules of Professional Conduct … govern all members of the bar of this court …." LR 83.1.g.1.

Turning then to those rules, Iowa Rule of Professional Conduct ("Rule") 32:1.9(a) prohibits "[a] lawyer who has formerly represented a client" from representing anyone adverse to that former client in "a substantially related matter."[8] Another separate prohibition is found in Rule 32:1.9(b), which prohibits a lawyer who was previously associated with a law firm from representing someone adverse to his former firm's client in a "substantially related matter" if "the lawyer had acquired information protected by rules 32:1.6 and 32:1.9(c) that is material to

---

[8] Rule 32:1.9(a) "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

the" subsequent litigation.[9]  If *any* attorney is disqualified under the "substantial relationship" standard, Rule 32:1.10 imputes that disqualification to that attorney's entire law firm.  Absent consent of the former client, which Autoscribe has never sought and Wells Fargo has not given, there is no provision in the Iowa Rules to remove such imputation.[10]  That is particularly true in a situation like this where Mr. Gilchrist has already appeared on behalf of Autoscribe and has been actively involved in the litigation.

In addition to the "substantial relationship" test, leading Eighth Circuit and Iowa disqualification decisions have also held that the common law "appearance of impropriety" standard based on Canon 9 is relevant to this issue.  *See State of Ark. v. Dean Foods Products Co.*, 605 F.2d 380 (8th Cir.1979), *overruled on other grounds*, *In Re Multi-Piece Rim Products Liab. Litig.,* 612 F.2d 377 (8th Cir.1980); *Hoffmann v. Internal Med., P.C. of Ottumwa*, 533 N.W.2d 834, 836 (Iowa Ct. App. 1995).  Although the "appearance of impropriety" standard was neither explicitly incorporated into nor superseded by the Model Rules, as one respected commentator has noted, Canon 9 has continued relevance and import:

> The Canon 9 concept is a common-law principle, so that the omission in the Model Rules has influenced but has not negated its viability.  Despite the

---

[9] Rule 32:1.9(b) "A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client (1) whose interests are materially adverse to that person, and (2) about whom the lawyer had acquired information protected by rules 32:1.6 and 32:1.9(c) that is material to the matter, unless the former client gives informed consent, confirmed in writing."

[10] Rule 32;1.10(a) "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rule 32:1.7 or 32:1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.  *See also* 16 IA. PRAC., LAWYER AND JUDICIAL ETHICS § 5:10(c) (2010) ("However, as applied to lawyers in private practice, ethical screening may not be used to avoid disqualification of an entire law firm, absent the former client's consent.").

> approach of the Model Rules, disqualification based on considering the appearance of impropriety is too well established as a common-law principle to be readily abandoned in most jurisdictions. Moreover, the standard of the appearance of impropriety is not based on the arguably unreliable perception of the complaining former client, but from the perspective of the public, the ordinary layman. An alternative statement is whether the impropriety would be recognizable by "all reasonable persons."

2 Legal Malpractice § 18:7 (2009). The reason is clear enough. Ethics rules are fundamentally about maintaining the confidence of the public in the profession to adhere to the high ethical standards respecting client confidences. There are few actions more likely to undermine the confidence of the public in the profession's respect for such confidences than a lawyer switching sides by first protecting a client's business as its trusted attorney and then attacking that same client on behalf of a "new" client.

### B.   The Substantial Relationship Test

Rules 1.9(a) and (b) provide two independent grounds for disqualification of an attorney, and both of those sections are applicable here. Under Rule 1.9(a), Mr. Gilchrist personally represented Wells Fargo and its predecessor in numerous legal matters during the first decade of his legal career. *See* Laurenzo Decl. at ¶¶ 17, 23-33. Additionally, under Rule 1.9(b), both of Mr. Gilchrist's prior firms represented Wells Fargo in intellectual property matters, and Mr. Gilchrist, while working directly with Mr. Laurenzo, was privy to and acquired sensitive and confidential Wells Fargo information during those representations that is material to this litigation. *Id.* at ¶¶ 11-17, 23-33. Accordingly, the primary issue is whether these prior matters for Wells Fargo "bear a 'substantial relationship" to this litigation. *See, e.g., Engineered Prods. Co. v. Donaldson Co., Inc.*, 290 F.Supp.2d 974, 980 (N.D. Iowa 2003).

Application of the substantial relationship test involves three separate inquiries.

[1]  First the court considers the nature and scope of the prior representation.

8

[2] Second the court examines the nature of the present lawsuit against the former client.

[3] Finally, the court considers whether the client might have disclosed a confidence to his or her attorney in the course of the prior representation which could be relevant to the present action.

See Hoffman, 533 N.W.2d at 837 (internal citations omitted). Under Iowa law, the former client must be given the presumption that confidential information was disclosed during the prior representation. See Doe v. Perry Cmty. Sch. Dist., 650 N.W.2d 594, 598 (Iowa 2002) (citing Richers v. Marsh & McLennan Group Assocs., 459 N.W.2d 478, 482 (Iowa 1990) (abuse of discretion existed where district court did not give former client the presumption that confidences were disclosed).

This and other courts have noted that "the leading Eighth Circuit case on attorney disqualification" issues involving former clients is *State of Arkansas v. Dean Foods Products Co.*, 605 F.2d 380 (8th Cir.1979), *overruled on other grounds*, *In Re Multi-Piece Rim Products Liab. Litig.,* 612 F.2d 377 (8th Cir.1980); *See Civco Med. Instruments*, No. 4:03-CV-40722, 2004 WL 1326474, at *8; *see also Doctor John's, Inc. v. City of Sioux City, Iowa*, No. C03-4121-MWB, 2007 WL 5788, at *7 (N.D. Iowa Jan. 2, 2007). Dean Foods was "a processor and seller of dairy products." *Dean Foods*, 605 F.2d at 382. The attorney ("Griffin") had previously worked for a law firm ("McHaney firm") that had represented Dean Foods in bankruptcy proceedings involving one of its distributors. *Id.* Years after leaving the McHaney firm, Griffin became Assistant Attorney General, and Dean Foods was subsequently indicted in an antitrust action. *Id.* Two years after the commencement of that action, Dean Foods moved for disqualification of Griffin, Griffin's staff counsel, and two other firms that the state had retained "as special antitrust co-counsel." *Id.* The Eighth Circuit held that Griffin and his staff counsel were disqualified from the case. *Id.* at 381.

9

In discussing the "substantial relationship" issue, the Eighth Circuit found that the bankruptcy "matter … involved considerations of sales structure, customer lists, and purchases" and it noted that "[a]n integral element in that matter was [the distributor's] accusation that Dean engaged in price-fixing." *Id.* at 384. The Eighth Circuit also found it immaterial that Griffin had no personal knowledge or substantial involvement in the bankruptcy matter, stating that it would "assume the disclosure of confidences" and it would "not inquire into their nature and extent" of such disclosure. *Id.* That analysis fits this case precisely and compels the same conclusion: disqualification.

During his prior representation of Wells Fargo, Mr. Gilchrist admittedly and indisputably had access to confidential information relating to Wells Fargo's financial systems, and that type of information will likely be relevant to Autoscribe's allegations of infringement in this case. This alone shows that Mr. Gilchrist's prior representation of Wells Fargo while at the Davis firm and Dorsey was "substantially related" to the current patent litigation.

### 1. The Prior Representation of Wells Fargo and the WFHM Business Unit

During his time at the Davis and Dorsey firms, Mr. Gilchrist's representation of Wells Fargo and its predecessor Norwest involved a variety of intellectual property matters including:

a) investigation of business method patents owned by third parties, including drafting memoranda summarizing the scope of protection granted in such patents;

b) investigation and analysis of confidential and proprietary WFHM computer software-based systems, processes, methods, projects, and plans;

c) comparing the claims of issued business method patents owned by third parties with the proprietary systems and processes performed or planned by WFHM;

10

      d)      counseling WFHM regarding actions it could or should take, or refrain from taking, in order to minimize potential exposure for liability under business method patents owned by third parties;

      e)      preparing legal opinions of non-infringement relied on by WFHM with respect to a patent owned by a third party;

      f)      preparing technology agreements between WFHM and its information technology vendors;

      g)      counseling Wells Fargo regarding the possibility of filing business method patent applications;

      h)      drafting and prosecuting patent applications, some of which were never made public, covering proprietary computer software-based systems and methods related to Financial Service Products offered and serviced by WFHM.

Laurenzo Dec. at ¶ 33.

      Of particular relevance to this motion is a WFHM matter to which Mr. Gilchrist billed nearly 200 hours between June 2001 and July 2004. *Id.* at ¶ 31. In August 2000, PricewaterhouseCoopers prepared the Operations Feasibility Study for WFHM, a written report providing details about the current operations structure used by WFHM's financial products' origination and servicing systems, along with providing suggestions for changes and improvements thereto. *Id.* at ¶ 24-26. The Operations Feasibility Study was a controlled copy document, meaning that every copy had to be accounted for and was forbidden to be copied; it was clearly designated "Restricted Information / Trade Secret" on its cover sheet, and was written for and reviewed by the most senior levels of management and technical personnel within WFHM. *Id.* at ¶ 25.

The Operations Feasibility Study included details about systems and processes used by WFHM to service its loans, including mortgage loans. *Id.* at ¶ 26. Among the aspects of these financial services products included in the study were items pertaining to making payments, including different forms of payment (credit card, debit card, check, and ACH) and verification of financial account information *Id.* at ¶ 26. In this litigation, Plaintiffs are accusing the pay-by phone products of these Wells Fargo financial systems of infringing Autoscribe's patents. Understanding or having knowledge of Wells Fargo's processes for verifying financial account information and for processing check and ACH payments will be critical to Autoscribe's ability to prove infringement in this case.

In or before July 2001 Mr. Gilchrist was provided with controlled copy #66 of the Operations Feasibility Study. *Id.* at ¶ 25, 27. Between July and October 2001 Mr. Gilchrist billed nearly forty hours reviewing and communicating with an in-house Wells Fargo attorney regarding this and other related highly confidential WFHM information. *Id.* at ¶ 29. At least one of Mr. Gilchrist's time entries specifically describes his detailed review of the Operations Feasibility Study document. *Id.* From 2001-2003, Mr. Gilchrist billed WFHM for numerous hours of work on this matter and, during that time he was communicating directly with and privy to correspondence with WFHM employees including in-house counsel. *Id.* at ¶¶ 29-30. Mr. Gilchrist analyzed the confidential WFHM systems and processes described in the Operations Feasibility Study and determined which Wells Fargo employees had invented certain aspects of those systems and processes such that he could describe the inventions and identify the inventors in a patent application, which was completed and filed in October 2002. *Id.* at ¶¶ 27-28.

Mr. Gilchrist continued to perform work for WFHM on this matter through at least July, 2004, *id.* at ¶ 30, which is the very same month and year in which his current client Autoscribe

contends that Wells Fargo had become "aware of the '315 [Autoscribe] patent." (Dkt. 1 at ¶ 16.) In addition to his work on the Operations Feasibility Study patent application and his analysis and investigation related thereto, Mr. Gilchrist also represented Wells Fargo in other patent and trademark matters, which exposed him to the business patterns and strategy at Wells Fargo as they relate to intellectual property. Laurenzo Decl. at ¶ 32-33. This long-term representation provided him with access to high-level Wells Fargo business, technical, and legal personnel. *Id.*

### 2. The Operation of WFHM is Central to This Litigation

Mr. Gilchrist's current client, Autoscribe, has now sued his former client, Wells Fargo, with only one specific allegation of infringement in the Complaint: the EasyPay$^{SM}$ service provided by WFHM to its customers permitting payments toward their mortgages to be paid using a checking account over the telephone. (Dkt. 1 at ¶¶ 15, 17, 26, and 28.) This is an aspect of the financial systems that Mr. Gilchrist would have reviewed and analyzed during his previous work for Wells Fargo, particularly during his investigation and analysis related to the Operations Feasibility Study. Laurenzo Decl at ¶ 26. Additionally, Mr. Gilchrist represented WFHM or its predecessors for many years with respect to numerous other patent-related matters, including matters involving the analysis of claims of patents owned by third parties to determine whether Wells Fargo might be infringing the patent. *Id.* at ¶¶ 32-33.

WFHM and its internal operations in Des Moines are at the center of the allegations in this case. This fact formed the basis for Wells Fargo's request to transfer this case from the Eastern District of Virginia to the WFHM headquarters in Des Moines, which the Virginia court correctly granted. Now Wells Fargo is presented with the uncomfortable scenario of potentially having a patent infringement lawsuit prosecuted against one of its business units by an attorney that formerly had trusted access to the most sensitive operations of that business unit.

### 3. Mr. Gilchrist and His Prior Firms' Representations of Wells Fargo and WFHM are Substantially Related to the Issues in this Litigation

Mr. Gilchrist's current client, Autoscribe, has accused his former client, Wells Fargo, of willful infringement based on his former client's provision of the EasyPay$^{SM}$ service beginning "at least as early as July 2004." (*See, e.g.,* Dkt. 1 at ¶¶ 16-21.) Moreover, Mr. Gilchrist's current client has indicated its intent to seek damages for alleged infringement by his former client going all the way back to January 2004.[11] In 2004, Mr. Gilchrist was still practicing with Mr. Laurenzo and representing WFHM on various intellectual property matters including work pertaining to the Operations Feasibility Study patent application. *Id.* at ¶ 30. Given these facts, it is indisputable that the work Mr. Gilchrist performed for his former client Wells Fargo is "substantially related to" at least the infringement, willfulness, and damages issues likely to arise in this case.

In addition, given the significant amount of time Mr. Gilchrist spent during his prior representation of Wells Fargo analyzing WFHM's highly-confidential and trade secret information, and given that such confidential information references systems and processes for accepting payments from WFHM customers, Mr. Gilchrist may be presumed to have received other confidential materials during his prior representation that are also substantially related to the ultimate issue of liability for alleged patent infringement in the present action. *See, e.g., Doe*, 650 N.W.2d at 598 (stating that in determining whether a substantial relationship exists, "[t]he former client must be given the presumption confidences were disclosed."). The McKee firm's

---

[11] *See, e.g.,* Plaintiffs' First Set of Interrogatories to Wells Fargo, attached hereto as Ex. C., at Interrogatory No. 7 (seeking information pertaining to "the number of financial transactions … since January 1, 2004"), which Plaintiffs served after Wells Fargo informed them of the conflict issue.

contention that Mr. Gilchrist now has no "working knowledge" of these confidences, *see* Ex. A, is for one, not correct, but it is also not relevant.

### C. The "Appearance of Impropriety" Standard

In addition to the fact that issues involved in Mr. Gilchrist's former representation of Wells Fargo and his current representation of Autoscribe are substantially related – which alone requires the disqualification of Mr. Gilchrist and his law firm under Iowa Rules 1.9 and 1.10, respectively – disqualification in this case is also proper under the common law "appearance of impropriety" standard. An example of the application of that standard is the Eighth Circuit's decision to disqualify former attorney Griffin's new staff counsel in the seminal *Dean Foods* decision. *Dean Foods Products Co.*, 605 F.2d at 387. There was no evidence that Griffin's new staff attorneys had actually received confidential information from Griffin pertaining to the prior representation of his former client, nevertheless, the Eighth Circuit held in disqualifying those attorneys that

> the public and bar deal in images and broad events, not in court findings. An appearance of impropriety thus arises from the general public and bar understanding and expectation that general discussions of firm business is the norm in small law firms, as the district court recognized, and a public and bar concern for the ability of a supervising lawyer to refrain from giving his staff directions based on confidential information he had earlier obtained.

*Id.* Since "a client has the right to expect, and the goals of the Code require us to assume, that the members and staff of a law firm working on a suit do so collectively rather than individually … a lawyer having earlier received confidential information, could at least inadvertently direct his staff to proceed along lines dictated or influenced by that information." *Id.*

Similarly, in *Doe v. Perry Cmty. Sch. Dist.*, the Iowa Supreme Court explained that the appearance of impropriety may be used as a factor in the attorney disqualification analysis. *See Doe*, 650 N.W.2d at 599. In that case, as is the case here, a substantial relationship between the

15

former and current representations was established. However, the Iowa Supreme Court explained that even if a substantial relationship between the representations did not exist, disqualification would be necessary to prevent the erosion of public confidence in the attorney-client relationship. *Id.*

> Under the facts before us, even if we concluded there is not a substantial relationship between the representations, that would not guarantee Bradshaw the ability to continue its current representation…. We presume … the … lawyers will act within the confines of our rules of ethics and professional responsibility. However, confidence in attorneys alone does not overcome the strong appearance of impropriety in cases such as this where the litigation involves sensitive and confidential matters.

*Id.* The facts of this case compel the same result. Iowa courts "look through the perspective of a reasonable layperson to decide whether an appearance of impropriety exists." *Id.* On the facts in this case, a reasonable layperson would conclude that, given Mr. Gilchrist's former representation of Wells Fargo on confidential technical and patent-related issues regarding the very business unit at issue in this case, Mr. Gilchrist's and the McKee firm's continued representation of Autoscribe not only disadvantages Wells Fargo, but also compromises the integrity of this litigation.

> The Eighth Circuit in *Dean Foods* noted:
>
> It is not necessary to presume that … any lawyer[] would intentionally employ a confidence against a client of his former firm. Nor is it possible to forestall surreptitious disclosure, if there be a lawyer so inclined and not involved in a case to which a client of his former firm is a party. Hence the imperatives of Canon 9.

*Dean Foods Products Co.*, 605 F.2d at 387, n. 11. Likewise, it is not necessary for this Court to presume that Mr. Gilchrist or any member of the McKee firm would intentionally or maliciously use to the disadvantage of Wells Fargo any of the confidences gained during Mr. Gilchrist's many years of representing Wells Fargo in intellectual property matters. That is neither relevant nor of determinative significance. What is necessary, however, is to remove Mr. Gilchrist and

16

his law firm from being put in a position where the disclosure of such confidences is a possibility – whether intentional or unintentional. As one court aptly observed, the attorney's new firm in a circumstance such as this "is thus in the position of either compromising its zeal in order to avoid making use of information probably known to one of its present associates, or compromising the confidences of that associate's former client." *Severino v. Dilorio*, 186 A.D.2d 178, 180 (N.Y. App. Div. 1992). Disqualification of Mr. Gilchrist and the McKee law firm in this instance is the only appropriate means to resolve such a conflict.

## IV.   CONCLUSION

For the foregoing reasons, Wells Fargo's motion to disqualify the McKee firm, and all of its attorneys from acting adversely to Wells Fargo in this action should be granted in all respects.

Dated: September 10, 2010   Respectfully submitted,

   /s/ Brian J. Laurenzo
Brian J. Laurenzo – AT0004513
Rush Nigut - AT0005794
BRICK GENTRY P.C.
6701 Westown Parkway, Ste 100
West Des Moines, IA  50266
Telephone: 515-274-1450
Fax: 515-274-1488
Email: brian.laurenzo@brickgentrylaw.com

Stephen E. Baskin
Frederick L. Whitmer
KILPATRICK STOCKTON LLP
607 14th Street, NW, Suite 900
Washington, DC  20005-2018
Telephone: (202) 508-5800
Facsimile:  (202) 508-5858
Email:  sbaskin@kilpatrickstockton.com

*Attorneys for Defendants Wells Fargo Bank, N.A. and Wells Fargo Financial, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of September, 2010, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS WELLS FARGO'S MOTION TO DISQUALIFY ATTORNEY MICHAEL C. GILCHRIST AND THE LAW FIRM OF MCKEE, VOORHEES & SEASE, P.L.C. AS COUNSEL FOR PLAINTIFFS** with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Michael C. Gilchrist
Edmund J. Sease
Jeffrey D. Harty
McKEE, VOORHEES & SEASE, P.L.C.
801 Grand Avenue, Suite 3200
Des Moines, IA 50309

ATTORNEYS FOR PLAINTIFFS

           /s/ Brian J. Laurenzo
Brian J. Laurenzo – AT0004513
Rush Nigut - AT0005794
BRICK GENTRY P.C.
6701 Westown Parkway, Ste 100
West Des Moines, IA  50266
Telephone: 515-274-1450
Fax: 515-274-1488
Email: brian.laurenzo@brickgentrylaw.com